**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jimmy Dewitt WEBSTER, Sr., Candido Daniel Santiago, Barry Weinreich, Joe Buhajla, Arthur Byron Murphy, and Clarence Royalston, Defendants-Appellants.**

No. 83–4550.

United States Court of Appeals,
Fifth Circuit.

Dec. 26, 1984.

Rehearings Denied Jan. 28, 1985.

Jack R. Jones, III (Court-Appointed), Southhaven, Miss., for Webster.

· Vincent J. Flynn, Milton E. Grusmark, Miami, Fla., for Santiago.

Ronald W. Lewis, Oxford, Miss., for Weinreich.

Stephen Nick (Court-Appointed), Greenville, Miss., for Buhajla.

J. Murray Akers (Court-Appointed), Greenville, Miss., for Murphy.

Robert B. McDuff (Court-Appointed), University of MS Law Center, University, Miss., for Royalston.

Glenn H. Davidson, John R. Hailman, Asst. U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Before WISDOM, RANDALL and JOLLY, Circuit Judges.

RANDALL, Circuit Judge:

A jury convicted appellants of various offenses arising out of an abortive scheme to import a large quantity of marijuana into the United States from Mexico. All six of them complain that the trial court mishandled an incident of jury misconduct that occurred late in the trial, during a break between closing arguments. Each appellant has also raised grounds for reversal unique to his own conviction. For the reasons set forth below, we affirm the convictions of all appellants except Clarence Royalston. Royalston's conviction is reversed because some of the evidence used to convict him was the product of an illegal arrest.

## I. FACTUAL BACKGROUND.[1]

The alleged drug conspiracy in this case began in February of 1983 when appellants Arthur Byron Murphy, Jimmy Dewitt Webster, and Candido Santiago stole an airplane in Florida and transported it to a remote Arkansas airstrip located on appellant Joe Buhajla's property. Agents of the Drug Enforcement Administration (DEA) learned that the plane might be used for drug trafficking and, pursuant to a court order, installed a transponder in the plane. Early on February 11, 1983, Murphy, the pilot, and passenger Gary Wells flew the stolen plane from Buhajla's airstrip to a spot near Acapulco, Mexico. They picked up a large quantity of marijuana there and began the return flight to the United States. Early that evening, the transponder signal was detected, and the plane was tracked to an area near Indianola, Mississippi.

Investigators informed local police officers and state and federal drug enforcement agents of the plane's activities and dispatched them to the Indianola airport. Murphy landed the plane at Indianola but was soon informed by a radio call from Webster, who was awaiting the plane's arrival, that police were in the vicinity. Murphy and Wells immediately took off again and flew to a prearranged, alternative landing site at Greenville, Mississippi. They abandoned the plane and marijuana at the city airport there and took a taxi into town. Murphy and Wells were both arrested in Greenville later that evening.

Meanwhile, back in Indianola, police arrived at the airstrip just in time to see the plane take off. Appellants Santiago, Clarence Royalston and Barry Weinrich (along with Mike Hartwell and Billy Freeman, who are not parties to this appeal) had also been awaiting the plane's arrival. Weinrich, Hartwell and Royalston had stationed a U-Haul truck near the runway; Santiago and Freeman positioned themselves near the airport entrance in a green Chevrolet and a camper, respectively. When police

---

1. We recite the facts in the light most favorable to the Government. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

approached, Royalston, Weinrich and Hartwell fled into the surrounding woods, but Santiago and Freeman stayed with their vehicles. Officers searched the U-Haul and discovered a pistol, an electric shock gun, a suitcase bearing Royalston's name tag, and a rental contract indicating that Royalston had leased the truck earlier that day in Memphis, Tennessee.

After a lengthy search of the area for suspects, officers returned to the green car and found Santiago hiding in the backseat. They arrested Santiago and discovered in the car a CB radio, a speeding ticket issued that day to Hartwell, and a rental agreement reflecting that Royalston had also rented the Chevrolet in Memphis earlier the same day.

At the Indianola jail, officers discovered in Santiago's possession a document indicating that Greenville had been chosen as an alternative landing site in the event of trouble at Indianola. They discovered the plane and marijuana there a short time later. Santiago also possessed a key to room 224 of a hotel that he identified as the Days Inn in Memphis, Tennessee. The room was registered to Weinrich, whom Santiago described as his partner. Based on this information, the room was placed under surveillance the next morning.

Early the next morning, Indianola police officer Keith Fullilove spotted an unidentified man (who, it turns out, was Royalston) on a roadside near the airport. Royalston, who apparently spent the night in the woods, was cold and wet and in need of a hot cup of coffee. Before Fullilove confronted Royalston, he received a radio call instructing him to bring the man in for questioning. Without discovering the man's identity, Fullilove ordered Royalston into the car and transported him to the Sunflower County Sheriff's Office. Royalston made an initial statement to investigators there that morning and, after a two-hour car ride to Oxford, Mississippi, made a second statement later that evening.

Meanwhile, surveillance of room 224 continued but a search warrant was not obtained. About 10:00 a.m., Webster knocked on the door but left when no one answered. Officers continued their surveillance and investigation until about 4:40 p.m. when Weinrich and Hartwell were let into the room by the hotel manager. Officers then verified Weinrich's identity with the manager and, a short time later, entered and "secured" the room: they frisked Weinrich and Hartwell for weapons and made sure no one else was in the room; they advised Weinrich and Hartwell of their rights and, after receiving suspicious answers to questions, placed the two under arrest; and they observed certain items in plain view and occupied the room until a search warrant was obtained about two and one-half hours later. After obtaining a warrant, officers thoroughly searched the room. In the meantime, Hartwell had consented to a search of his room, which was located at the same hotel. Both searches turned up evidence linking Weinrich and Hartwell to the activities the night before in Indianola and Greenville.

Buhajla, Freeman, Murphy, Royalston, Santiago, Webster, Weinrich and Jack Syphan were indicted and tried together for their involvement in the theft of the airplane and the importation and possession of the marijuana. Wells was not indicted, but cooperated with the Government and testified extensively at trial. After a lengthy trial, Freeman was found not guilty; the jury convicted the others of various offenses and all but Syphan have appealed. The offenses charged in the indictment, the jury's verdict and the trial court's sentences thereon are reproduced in the margin.[2]

---

**2.** Count 1: Interstate transportation of a stolen aircraft, 18 U.S.C. § 2312;

Count 2: Conspiracy to possess with intent to distribute and conspiracy to distribute approximately 1500 pounds of marijuana, 21 U.S.C. § 841;

Count 3: Possession with intent to distribute 1500 pounds of marijuana, 21 U.S.C. § 841(a)(1), (b)(6);

Count 4: Importation into the United States of a controlled substance, 21 U.S.C. §§ 952, 960.

## II. CONTENTIONS ON APPEAL.

The appellants have made extensive use of Fed.R.App.P. 28(i), which permits the adoption by reference of the briefs filed by other parties. All appellants complain that the trial court erred by conducting an in camera voir dire of the jury, outside of the presence of counsel, to assess the effect of an incident of jury misconduct that occurred during closing arguments. In addition, three distinct issues have been raised with respect to the trial court's rulings on various pretrial motions to suppress evidence: (1) Buhajla argues that all evidence linked to the installation of the transponder should have been suppressed because the court order authorizing the transponder was not based on probable cause to believe that Buhajla was involved in the drug conspiracy; (2) Royalston claims that the second statement he made to DEA agents at Oxford, Mississippi, should have been suppressed, just as the first statement he made at Indianola was suppressed, because it was the fruit of an illegal arrest; and (3) Weinrich and Santiago argue that *all* evidence discovered in room 224 of the Days Inn, whether noticed in plain view when officers first entered the room or turned up during the later search pursuant to a warrant, should have been suppressed because the initial warrantless entry into the room was illegal. Finally, various parties complain of errors committed during trial and attack the sufficiency of the evidence to support their convictions. We treat the claims on appeal in the order that the errors allegedly occurred at trial: (1) the failure to suppress evidence; (2) evidentiary and other rulings during trial; (3) the in camera hearing on jury misconduct; and (4) the failure to direct judgments of acquittal because of insufficient evidence.

## III. THE FOURTH AMENDMENT ISSUES.

▮ The trial court conducted extensive hearings on the many pretrial motions to suppress evidence and made detailed findings of fact with respect to each of the fourth amendment issues now before us. We note at the outset the well-established principles governing our review of the proceedings below: (1) we are bound by the district court's findings of fact unless they are clearly erroneous, *see United States v. Gunn*, 428 F.2d 1057, 1060 (5th Cir.1970); (2) the defendant bears the burden of demonstrating the illegality of police conduct supported by a warrant; the opposite is true for warrantless police activity, *see, e.g., Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); *United States v. Impson*, 482 F.2d 197, 199 (5th Cir.), *cert. denied*, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973); and (3) with respect to the relationship between a fourth amendment violation and specific evidence, defendant "must go forward with specific evidence demonstrating taint"; the

| Defendant-appellant | Conviction | Sentence |
|---|---|---|
| 1. Joe Buhajla | count one | two years |
| 2. Arthur Byron Murphy | count one | four years |
| | count two | four years, consecutive |
| | count three | four years, concurrent |
| | count four | four years, concurrent |
| 3. Clarence Royalston | count three | two years |
| 4. Candido Santiago | count one | four years |
| | count two | four years, consecutive |
| | count three | four years, concurrent |
| | count four | four years, concurrent |
| 5. Jimmy Dewitt Webster | count one | four years |
| | count three | eight years, consecutive |
| | count four | four years, concurrent |
| 6. Barry Weinrich | count two | two years |
| | count three | two years, concurrent |
| | count four | two years, concurrent |

Government "has the ultimate burden of persuasion to show that its evidence is untainted," *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969). *See generally* 3 W. LaFave, *Search and Seizure* § 11.2 (1978). With these principles in mind, we turn to the specific fourth amendment issues raised on appeal.

A. *Buhajla's Motion to Suppress.*

Buhajla sought below to suppress "all evidence that is logically and systematically connected to [the February 10, 1983, installation of a] transponder" in an airplane located at his airstrip. Record Vol. I at 185. The transponder, which ultimately emitted the signal that allowed agents to track Murphy's plane to Indianola, was installed in the early morning hours of February 10, 1983, pursuant to a court order signed by a magistrate of the Eastern District of Arkansas. The order was issued on the strength of an application and affidavit submitted by DEA agent Larry Carver. The affidavit avers that a confidential informant (CI) with personal knowledge of the activities of Murphy and Webster advised DEA agents that Murphy and Webster transported a King Air airplane of foreign registry to a private airstrip located near Ozark, Arkansas, owned by a person with a German name, and that the plane had since been used twice to import marijuana from Mexico. The affidavit also indicates that (1) a King Air (registration No. YV-437-CP) had been stolen on January 31, 1983, in Florida; (2) that, on February 3, 1983, Carver spotted an aircraft matching the description given by the CI at Buhajla's airstrip; (3) that a state drug enforcement agent determined that the plane on Buhajla's property bore registra-

tion number N-487-OP; and (4) that, according to FAA records, N-487-OP is not a valid registration number. Finally, the affidavit includes general information supporting the conclusion that the plane on Buhajla's property might be used for dope smuggling: (1) Webster and Murphy have a history of illegal drug activity and have previously used stolen aircraft with altered registration numbers and (2) drug smugglers often use aircraft similar to the King Air.

The court order, which recites "probable cause to believe that [the King Air] is about to be utilized by ... Murphy and others" to violate federal drug laws, authorizes installation and maintenance of the transponder for a period of ninety days. By necessary implication, it also authorizes surreptitious entry onto Buhajla's property for the purposes of installation, maintenance and removal of the transponder.[3] DEA agents and customs officers in fact surreptitiously entered Buhajla's property and installed the transponder under cover of darkness in the early morning hours of February 10, 1983.

Buhajla attacked the transponder order below on what we view as two distinct grounds: (1) it was based upon a generally unreliable affidavit which does not even demonstrate probable cause to believe that the *plane* was involved in illegal activity and (2) it authorized entry onto Buhajla's property without probable cause to believe that Buhajla was involved in illegal activity with the plane.[4] The district court denied Buhajla's motion to suppress because, notwithstanding a typographical error in Carver's affidavit which created an inconsistency with respect to the date upon which surveillance of the King Air began, the transponder order was supported by proba-

---

**3.** The order authorizes agents to "enter [the King Air], including any aircraft maintenance shop housing or protecting such aircraft," Record Vol. I at 187, but does not specifically state the manner in which entry onto Buhajla's property should be accomplished. Carver's affidavit, however, makes clear that "[i]t will be necessary to enter the aircraft in a surreptitious manner to avoid detection. It is necessary to install the transponder and tracking device un-

der the cover of darkness to prevent said installation from being compromised." Record Vol. I at 194.

**4.** Buhajla made additional specific attacks on the court order which the district court resolved in favor of the Government. Buhajla does not complain of the court's rulings on these issues, and we therefore do not address them.

ble cause sufficient to justify surreptitious entry onto Buhajla's property.

On appeal, Buhajla relies exclusively on the argument that agents lacked probable cause to connect Buhajla to the importation of marijuana. In fact, at oral argument Buhajla's counsel conceded that agents had probable cause to connect the *plane* to illegal activity and that an order authorizing agents to enter his property during the daytime to seize the plane would have been justified.[5]

Buhajla's argument is less than clear. Apparently, he asserts that the legality of a transponder warrant depends on the time and manner in which it is to be executed: an order for a daytime installation which is to be accomplished with the knowledge of the landowner upon whose property the object of the order is located requires only probable cause to believe that the plane will be used in illegal activity by *someone;* an order for a nighttime, surreptitious installation, because of the danger posed to a landowner who might wake up and investigate the presence of intruders, requires probable cause to believe *both* that the plane will be used in illegal activity *and* that the landowner is involved in that activity. Buhajla claims that in this case the magistrate was presented with the former but not the latter.

We note at the outset that the precise fourth amendment requirements governing the installation and monitoring of beepers are still evolving. Our cases thus far have focused on two distinct issues: (1) whether the initial installation of a transponder or beeper amounts to a search of the subject vehicle [6] and (2) whether the subsequent monitoring of the beeper amounts to a search implicating fourth amendment protections.[7] Our prior installation cases,

---

5. Even if Buhajla's general attack on the sufficiency of Carver's affidavit was still before us, we would be constrained to agree with the district court that the magistrate's determination of probable cause was amply supported. In those cases where we have assumed that a warrant is required for transponder installation, we have held that such a warrant may issue on "probable cause that ... the aircraft was about to be used for illegal drug trafficking." *United States v. Flynn,* 664 F.2d 1296, 1305 (5th Cir.), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). Considering the laminated total of the information in Carver's affidavit, *see id.* at 1304, including the totality of the circumstances surrounding the information supplied by the CI, *see Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983), we are convinced that the showing of probable cause that the King Air would be used in drug trafficking was sufficient to support the transponder order. Carver's affidavit reveals information from DEA agents about Webster and Murphy's past pattern of drug operations, *see Flynn,* 664 F.2d at 1305; information from a CI who has provided reliable information in the past that the King Air was currently involved in drug smuggling; and independent corroboration of the CI's information that the King Air was stored on Buhajla's property and may have had an altered registration number, *see Illinois v. Gates,* 103 S.Ct. at 2334. Acknowledging the "great deference" we owe the magistrate's determination, *see id.* at 2331, we are convinced of probable cause to connect the King Air to drug smuggling.

6. In *United States v. Michael,* 645 F.2d 252 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 950, 102

S.Ct. 489, 70 L.Ed.2d 257 (1981), we decided that the attachment of a beeper to the outside of a vehicle parked in a public place does not constitute a search. Probable cause and a warrant are not required for such activity; "reasonable suspicion" will suffice. *Id.* at 257. We have yet to decide whether a beeper installation accomplished by entering the interior of a vehicle is a search that must be supported by a warrant issued on probable cause. *See, e.g., United States v. Kupper,* 693 F.2d 1129, 1130 n. 1 (5th Cir.1982); *United States v. Cady,* 651 F.2d 290, 291 (5th Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). In *United States v. Butts,* 710 F.2d 1139, 1147 (5th Cir. 1983), a divided panel of this court did decide that such an installation is a search but its opinion was vacated when we voted to rehear the case en banc. *See* Fifth Cir. Local R. 41.3. The en banc court decided the case without reaching the question whether installation of a transponder in the interior of a vehicle requires a warrant supported by probable cause. *United States v. Butts,* 729 F.2d 1514 (5th Cir.) (en banc) (monitoring transponder two days after expiration of period authorized in warrant does not require suppression), *cert. denied,* — U.S. ——, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984).

7. The Supreme Court has recently decided two cases dealing with the fourth amendment implications of monitoring beeper signals. *See United States v. Karo,* — U.S. ——, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (no fourth amendment violation from installation of beeper in contraband not yet transferred to defendants; warrantless monitoring of beeper while contraband

however, have involved vehicles parked on public property or on property in which no one involved has asserted a protected privacy interest. Here, Buhajla does not complain of the entry into the plane to install the transponder; rather, he complains of the entry onto his property to gain access to the plane. More specifically, he complains that, because of the dangers posed to his family, covert execution of the transponder order was not justified on the information supplied to the magistrate.

■ Even if we assume that Buhajla's property was searched on the morning of February 10 [8] and that Buhajla has standing to complain of evidence obtained thereby,[9] Buhajla's argument is fundamentally flawed for two reasons. First, Buhajla does not argue that surreptitious execution of transponder orders is always forbidden. Rather, he argues that the danger posed by

such activity is only justified if there is probable cause to believe *both* that the vehicle is involved in illegal activity and that the owner of the premises upon which the vehicle is stored is involved in that illegality. Assuming that Buhajla has correctly stated the law, his argument fails because we think that Carver's affidavit in fact established probable cause to believe that Buhajla was involved in drug smuggling activity. Buhajla has conceded probable cause to believe that a small aircraft parked at a remote airstrip located on a private farm, near the farmer's residence, was twice used for drug smuggling during a one-week period. It seems inescapable to us that on such facts probable cause also existed to believe that the farmer was involved in the illegal activity. We find it difficult to imagine a case where a landowner could establish, on the one hand,

located in place not open to visual surveillance violates fourth amendment); *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (warrantless monitoring of beeper installed in contraband does not violate fourth amendment when it simply enhances ability to learn information otherwise available from visual surveillance from public places).

8. Although we need not decide the issue, we note that at least one commentator finds it an easy question: "As for the attachment of the beeper to the vehicle, it seems clear that if this is accomplished by entering a garage or similar place in order to gain access to the vehicle, then this act in itself amounts to a Fourth Amendment search." 1 LaFave, *Search and Seizure* § 2.7(d) at 419.

Of course, this assumes that the "garage or similar place" is one in which there is a protected privacy interest. The Government argues on brief that the King Air may not have been located within the curtilage of Buhajla's residence and outbuildings and that the fourth amendment was perhaps not implicated by the agents' late night foray onto Buhajla's property. *See Oliver v. United States,* — U.S. —, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (open fields doctrine retains vitality; leaving open the exact scope of the curtilage exception). *See also United States v. Williams,* 581 F.2d 451, 453 (5th Cir.1978), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Baldwin,* 691 F.2d 718 (5th Cir.1982). Since the Government conceded at oral argument that the plane was probably within the curtilage, and since the district court made no findings on the issue, we assume that a warrant was required to

enter that portion of Buhajla's property on which the King Air was stored.

9. Our decisions establish that standing to complain of an illegal transponder installation is reserved to those with a "possessory interest in the suspect plane" or a "legitimate expectation of privacy with respect to its interior." *United States v. Whitley,* 670 F.2d 617, 619 (5th Cir. 1982) (member of ground crew lacks standing to attack transponder installation). *See also United States v. Parks,* 684 F.2d 1078 (5th Cir. 1982) (pilot lacks standing absent showing of proprietary interest in plane or legitimate possession thereof); *United States v. Strmel,* 744 F.2d 1086 (5th Cir.1984) (post-installation passenger lacks standing). In this case, however, Buhajla is attacking entry onto property in which he has a legitimate expectation of privacy without regard to his interest, if any, in the airplane. The Government raised the issue below, but the district court apparently assumed that Buhajla has standing. Since no one raises standing on appeal, we assume, without deciding, that a violation of Buhajla's privacy interest in his property, through which agents gained access to the airplane, would have given him standing to suppress the fruits of the transponder order. *Cf. Alderman v. United States,* 394 U.S. 165, 176–77, 89 S.Ct. 961, 968–69, 22 L.Ed.2d 176 (1969) ("If the police make an unwarranted search of a house and seize tangible property belonging to third parties ... the homeowner may object to its use against him, not because he had any interest in the seized items as 'effects' protected by the Fourth Amendment, but because they were the fruits of an unauthorized search....").

that an airplane which he effectively concedes is used in drug smuggling was located within the curtilage of his residence and, on the other hand, that probable cause was lacking to connect him to the illegality. At any rate, this is not such a case.

More importantly, we are not convinced that Buhajla has correctly stated the law. He cites no authority in support of his theory and we have searched in vain to find any. We start with the general proposition that a search warrant, unlike an arrest warrant, may issue, without the slightest clue to the identity of the criminal, if there is probable cause to believe that fruits, instrumentalities or evidence of criminal activity are located at the place to be searched. *See* 1 LaFave, *Search and Seizure* § 2.1(b) (1978) ("Indeed, 'probable cause might well be established to suspect that illegal activity, evidence thereof or contraband, was at a given location without implicating any particular person.'") (quoting *United States v. McNally*, 473 F.2d 934, 941 (3d Cir.1973)). We think it is clear beyond question, therefore, that a warrant authorizing entry onto private property to gain access to a vehicle for purposes of transponder installation may issue without probable cause to connect the property owner to the illegal activity.

Buhajla concedes that point but argues that a different rule applies when a warrant is to be executed by covert entry onto the premises to be searched. He claims that the dangers posed by covert execution of a warrant justify a heightened probable cause standard. We disagree. In *Dalia v. United States*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979), the Supreme Court addressed the propriety of covert execution of an electronic surveillance order issued pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520. The Court rejected a constitutional rule prohibiting all covert entries: "It is well established that law officers may break and enter to execute a search warrant where such entry is the only means by which the warrant effectively may be executed." *Id.* at 247, 99 S.Ct. at

1688. The Court went on to hold that a surveillance order may be executed by covert entry even though the order does not "explicitly set forth its approval of such entries before the fact." *Id.* at 255, 99 S.Ct. at 1692. Said the Court: "Often in executing a warrant the police may find it necessary to interfere with privacy rights not explicitly considered by the judge who issued the warrant." *Id.* at 257, 99 S.Ct. at 1693.

Although *Dalia* rests in part on statutory interpretation, we think it clarifies some fourth amendment principles of general application: "[T]he specificity required by the Fourth Amendment does not generally extend to the means by which warrants are executed"; rather, "the manner in which a warrant is executed is subject to later judicial review." *Id.* at 257–58, 99 S.Ct. at 1693–94. Based on these principles, we reject Buhajla's argument that issuance of a transponder order that will be executed by surreptitious entry requires a greater showing to the issuing judge or magistrate than one that will be executed openly. After-the-fact judicial review of the reasonableness of the execution will suffice to protect privacy interests.

Here, the district court found that, notwithstanding the late night entry onto Buhajla's property, the transponder order was executed in a reasonable manner. We agree. As in *Dalia*, it appears that "the circumstances required the [covert] approach used by the officers," *id.* at 248 n. 8, 99 S.Ct. at 1689 n. 8, and that "[t]here is no indication that their intrusion went beyond what was necessary to install" the transponder. *Id.* at 258 n. 21, 99 S.Ct. at 1694 n. 21. Therefore, we must affirm the denial of Buhajla's motion to suppress.

B. *Royalston's Motion to Suppress.*

Royalston moved to suppress "all statements and other evidentiary matters obtained as a result of his illegal arrest on or about February 12, 1984." Record Vol. I at 143. The principal matters at issue below were two oral statements Royalston made to drug enforcement agents on Feb-

ruary 12: (1) the statement given to Mississippi Bureau of Narcotics (MBN) agent Dennis McAnally at about 9:30 a.m. at the Sunflower County Sheriff's Office in Indianola and (2) the statement given to DEA agents John Maddox and Rick Humphreys at about 7:00 p.m. at the Lafayette County Jail in Oxford.

Royalston argued below that Fullilove illegally seized him in violation of the fourth amendment when, early on the morning of February 12, he ordered him into his police car and drove him to the county sheriff's office for questioning. He further argued that both statements are fruit of the illegal arrest and should have been suppressed. The district court agreed that Royalston had been illegally arrested without probable cause and therefore suppressed the Indianola statement; the court found, however, that the Oxford statement was attenuated from the illegality and should be received in evidence. Royalston claims on appeal that the Oxford statement should also have been suppressed because no intervening events occurred sufficient to divorce the statement from the illegal arrest.

The Government seeks to uphold the district court's finding of attenuation and also to support the court's ruling on the Oxford statement on either of two additional theories rejected below: (1) Royalston consented to the trip to the Sunflower County Sheriff's Office and, therefore, had not been seized in a fourth amendment sense when he entered Fullilove's squad car and (2) at any rate, the collective knowledge of the investigating officers and agents with whom Fullilove was in contact amounted to probable cause for a full-blown arrest of Royalston as he stood on Airport Road.

The relevant facts, as found by the district court, are as follows: After abandoning the U-Haul and fleeing the scene, Royalston spent the night of February 11 in the woods surrounding the Indianola airport. Early the next morning, he was cold and wet and began knocking on doors in search of hot coffee. A local resident reported Royalston's behavior to the Indianola police, and Fullilove was dispatched to investigate. Fullilove drove to the area around the airport and en route spotted a man by the side of the road. The man flagged the officer down. Before Fullilove got out of the car, he received a radio call instructing him to bring whomever he discovered while investigating the citizen's complaint to the county sheriff's office for questioning. Fullilove then got out of his car and approached the man; the man told Fullilove that he needed some hot coffee and dry clothes. Fullilove told the man to get into the car and, without determining his identity or asking any investigatory questions, drove him to the sheriff's office. Once there, officers placed the man in a small conference room and advised him of his *Miranda* rights. When the man began emptying his pockets, officers discovered that he possessed a U-Haul key and a driver's license bearing the name Clarence Royalston. Since the U-Haul and the chevrolet discovered at the airport were both rented to a Clarence Royalston, this discovery undoubtedly gave officers probable cause to connect the man to the drug activities of the previous evening. It is undisputed, however, that until this point no one connected with the investigation knew that the man discovered by Fullilove was in fact Royalston or even knew what Royalston looked like.

After being advised that a drug enforcement agent was on the way to investigate, Fullilove left Royalston with sheriff's deputy Thomas Dawson. About 9:30 a.m., MBN agent Dennis McAnally arrived at the jail and was informed that Royalston wished to speak to an agent. He advised Royalston of his rights and, in the presence of agent Richard Oakes and deputy sheriff Marvin Farmer, interviewed Royalston and received a statement about his involvement in the activities at the Indianola airport.

Royalston remained at the Indianola jail until early afternoon when DEA agents Maddox and Humphreys arrived to transport Royalston and some of the other defendants to Oxford, Mississippi—about a two-hour drive. Before they left, Royal-

ston informed Maddox that he would again like to talk, but Maddox told him that he would have to wait until they arrived at Oxford. Maddox and Humphreys rode to Oxford in one car with Murphy, Wells and Santiago; Royalston and Freeman rode in a separate car with Sunflower County sheriffs until they reached the county line; at that point, they were transferred to a Panola County sheriff's vehicle for the rest of the trip. At Oxford, Royalston was placed in a cell by himself for one or two hours. At about 7:00 p.m., Humphreys and Maddox again advised Royalston of his rights and received his second statement. As noted, the district court suppressed the Indianola statement but received evidence of this second statement at trial.

■ The fourth amendment principles governing the resolution of Royalston's claims are easily stated; their application to the unique facts of this case is not quite so simple. The legality of police-citizen encounters, of course, depends on the degree to which the police intrude upon the liberty of the individual and the nature of the information upon which they act. Voluntary interaction between the state and its citizens, as well as police-initiated contact which a reasonable person would not feel compelled to continue, do not implicate fourth amendment protections. *See, e.g., United States v. Berry,* 670 F.2d 583, 590 (5th Cir.1982) (Unit B) (en banc). A "seizure" of the person, on the other hand, must be supported by probable cause unless it falls within a narrow exception to the probable cause requirement reserved for police activity that does minimal violence to the "sanctity of the person." Reasonable suspicion suffices for seizures within this category. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).

The line between minimally intrusive seizures which must be supported by reasonable suspicion and police-citizen interchanges which are outside the scope of the fourth amendment has often been a difficult one to draw. *See, e.g., United States v. Elmore,* 595 F.2d 1036, 1041–42 (5th Cir.1979) (whether seizure has occurred "often requires a 'refined judgment,' especially when no force, physical restraint, or blatant show of authority is involved"), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980) (quoting *United States v. Wylie,* 569 F.2d 62, 68 (D.C.Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978)). In the absence of a definitive answer from the Supreme Court, we have held that police cross the fourth amendment line when "under the totality of the circumstances, a reasonable person would have thought he was not free to leave." *United States v. Robinson,* 625 F.2d 1211, 1216 (5th Cir.1980). *See also United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J., plurality opinion); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (White, J., plurality opinion).

■ The Supreme Court has, however, given us greater guidance in drawing the line between brief seizures that are justified on reasonable suspicion and more intrusive police conduct that must be supported by probable cause. A "brief, on-the-spot stop and a frisk for weapons" for the protection of the police officer gave birth to the *Terry* reasonable suspicion exception to the probable cause requirement, *Dunaway,* 442 U.S. at 209, 99 S.Ct. at 2254; a full-blown arrest rests at the opposite end of the spectrum and, of course, is illegal unless supported by probable cause, *id.* at 212, 99 S.Ct. at 2256. While brief, investigatory seizures may fall within the *Terry* exception absent a fear for the police officer's safety, *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court has made it clear that "custodial questioning [without the consent of the suspect] on less than probable cause for a full-fledged arrest" is illegal. *Dunaway,* 442 U.S. at 202, 99 S.Ct. at 2251. In *Dunaway,* detectives who admittedly lacked probable cause to arrest took petitioner, who was suspected of mur-

der, into custody and transported him to police headquarters for questioning. After receiving *Miranda* warnings, petitioner made incriminating statements and drew sketches of the crime scene. The Court found that petitioner had been illegally detained and reversed his conviction because the fruit of that detention—his statements and sketches—was received in evidence. Said the Court:

In contrast to the brief and narrowly circumscribed intrusions involved in [*Terry*] cases, the detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that petitioner was not told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.

*Id.* at 212–13, 99 S.Ct. at 2256–57 (citation omitted).

Royalston's trip to the sheriff's office and subsequent interrogation are in most respects indistinguishable from Dunaway's treatment: (1) Royalston was not questioned briefly where he was found; (2) he was ordered into Fullilove's squad car; (3) he was never informed that he was free to

go; (4) he would have been physically restrained if he had tried to escape; and (5) he was questioned at the sheriff's office after receiving *Miranda* warnings. The Government claims, however, that this case is in fact distinguishable from *Dunaway* in three important respects: (1) Royalston consented to the trip with Fullilove to the sheriff's office; (2) at any rate, probable cause existed for a full-blown arrest; and (3) Royalston's second statement was not the fruit of his initial detention. We consider these claims in turn.

### 1. *Consent.*

*Dunaway*, of course, does not change the rule that a voluntary trip to the police station for questioning does not implicate the fourth amendment. *See, e.g., United States v. Brunson,* 549 F.2d 348, 357 (5th Cir.), *cert. denied,* 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977). The Government argues that Royalston consented to the ride with Fullilove to the sheriff's office and that, therefore, no seizure occurred until "[Royalston] got to the station and was informed he was not free to go and advised of his rights." Government's Brief at 61. We reject this argument because (1) we agree with the district court that the Government did not discharge its burden of demonstrating that Royalston consented to the trip to the police station for questioning and (2) even if Royalston was not arrested until he arrived at the sheriff's office, the arrest occurred without probable cause.

The Government argues that Royalston's appearance and behavior made Fullilove reasonably suspicious about Royalston's potential involvement in the drug operation. Thus, a *Terry* investigatory stop would have been justified out on Airport Road. The Government argues further, that, by ordering Royalston into the car but at the same time refraining from asking any investigatory questions, Fullilove froze the situation and merely transported them both, as if in a time capsule, to the sheriff's office where agents then permissibly carried out the investigation that could have

been accomplished on the roadside. Under this theory, reasonable suspicion ripened into probable cause at the sheriff's office when Royalston's driver's license and U-Haul key were discovered.

We would reject this argument out of hand but for Royalston's desire for coffee and his apparent willingness to ride with Fullilove to get it. *See Dunaway*, 442 U.S. at 209, 99 S.Ct. at 2254. Under the Government's theory of this case, however, we should view the trip from Airport Road to the sheriff's office in isolation from the other events of the morning: Fullilove had reasonable suspicion when he approached Royalston but, before acting upon it, he and Royalston took time out for coffee; since Royalston consented to, and in fact actively sought out, a ride to a place that served coffee, and since he received coffee when he arrived at the sheriff's office, we should ignore the trip downtown for purposes of evaluating the legality of Royalston's arrest. Once the voluntary trip for coffee was out of the way, under the Government's view of the case, Royalston and Fullilove were free to resume the encounter that began on Airport Road.

While this argument may have a surface appeal, it cannot withstand close scrutiny. Absent Royalston's desire for coffee, these facts would present a clear case of a seizure tantamount to a full-blown arrest, virtually indistinguishable from *Dunaway*: Fullilove was given specific instructions to pick up Royalston and to transport him to the police station; he ordered Royalston into the car and brought him downtown for custodial questioning. We have no difficulty agreeing with the district court that a

reasonable person under such circumstances would not consider himself free to end the encounter with police.

■ Moreover, we refuse to characterize Royalston's consent to a ride for coffee as consent to custodial interrogation. We hold that the Government cannot discharge its burden of demonstrating consent to what would otherwise constitute a full-blown seizure by demonstrating uninformed consent to what a reasonable person would consider an innocuous exchange. Fullilove's silence about the true nature of the trip to the sheriff's office vitiated Royalston's consent. *Cf. United States v. Tweel*, 550 F.2d 297 (5th Cir.1977) (consent induced by deceit, trickery, or misrepresentation is not effective). Therefore, we cannot characterize the district court's finding that an illegal arrest took place as erroneous.

At any rate, the record demonstrates that, once at the sheriff's office, Royalston was given *Miranda* warnings and subject to a seizure of *Dunaway* proportions prior to the discovery of the U-Haul key and the driver's license.[10] Thus, even under the Government's theory of the case, Royalston was arrested before probable cause developed. Therefore, we reject the Government's claim that the seizure of Royalston was supported by consent.

### 2. *Probable Cause.*

The Government argues that, at any rate, probable cause to arrest Royalston existed when Fullilove approached him as he stood on Airport Road. The Govern-

---

**10.** Fullilove testified at the suppression hearing as follows:

Q Now, I'd like to ask you one other thing. From the complaint that Agent Maddox signed—rather, the affidavit—he said in this affidavit that Clarence—that the man identified himself to you as Clarence Royalston and admitted being at the airport and renting the U-Haul truck in question. Is that true?

A I got his name first when I saw his license. And after we found the key, when he put his belongings on the table, we asked him— we referred to a U-Haul truck, something,

because it had U-Haul on it, did he have a vehicle around here that this key went to, and he told us it went to a truck that was parked out at the airport.

Q All right. So you asked him about what that key was for?

A Yeah.

Q And at that time, had you given him any kind of advice of rights?

A Yes, we gave him that verbally. I mean, you know, we didn't get him to sign a form, but we did—

Record Vol. III at 11–12.

ment concedes that Fullilove himself did not know all the facts constituting probable cause; rather, the Government argues that the arrest was legal because the collective knowledge of the agents working on the case amounted to probable cause to arrest Royalston. Since Fullilove communicated with the other agents, the Government argues, their knowledge is imputed to him for purposes of evaluating the legality of the arrest. We reject this claim because it is clear to us that the collective knowledge of the agents working on this case did *not* establish probable cause to arrest Royalston as he stood on Airport Road. Collective knowledge did perhaps establish probable cause when agents discovered Royalston's driver's license and U-Haul key; by that time, however, the illegal arrest had already occurred.

Probable cause to arrest exists "where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Preston,* 608 F.2d 626, 623 (5th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980) (quoting *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959)). That is not to say, however, that the arresting officer himself must have personal knowledge of all the facts constituting probable cause for an arrest. The Government correctly points out that " 'probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest,' when there is 'some degree of communication between the two.' " *United States v. Ashley,* 569 F.2d 975, 983 (5th Cir.), *cert. denied,* 439 U.S. 853, 99 S.Ct. 163, 58 L.Ed.2d 159 (1978).

It is equally clear, however, that we will not allow the collective knowledge doctrine to be used as a subterfuge to evade probable cause requirements. *Cf. Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (Government may not bootstrap probable cause from innocent act of police officer following instructions to arrest). We have applied what has been loosely labelled the collective knowledge doctrine in two distinct types of cases: (1) those where the arresting officer has no personal knowledge of *any* of the facts establishing probable cause, but simply carries out directions to arrest given by another officer who does have probable cause, *e.g., United States v. Impson,* 482 F.2d 197 (5th Cir.), *cert. denied,* 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973); *United States v. Allison,* 616 F.2d 779 (5th Cir.), *cert. denied,* 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980); and (2) those where the arresting officer has personal knowledge of facts which standing alone do not establish probable cause but, when added to information known by other officers involved in the investigation, tips the balance in favor of the arrest, *e.g., United States v. Nieto,* 510 F.2d 1118, 1120 (5th Cir.), *cert. denied,* 423 U.S. 854, 96 S.Ct. 101, 46 L.Ed.2d 78 (1975); *United States v. Agostino,* 608 F.2d 1035, 1037 (5th Cir.1979). In the former cases, the officer who issues the directive must himself have probable cause to arrest. *Weeks v. Estelle,* 509 F.2d 760, 765 (5th Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 139, 46 L.Ed.2d 103 (1975); *United States v. Simpson,* 484 F.2d 467, 468 (5th Cir.1973). In the latter cases, the "laminated total" of the information known by officers who are in communication with one another must amount to probable cause to arrest. *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978); *Agostino,* 608 F.2d at 1037.

In this case, Fullilove received a radio call directing him to accomplish what we consider an illegal arrest of Royalston. *See* part III, B, 1, *supra.* Apparently, Fullilove was directed to bring in whomever he discovered while investigating a citizen complaint that a man was knocking on doors in search of hot coffee. If the Government's position is that the collective knowledge of the agents issuing that di-

rective to Fullilove constituted probable cause, we emphatically reject it. To accept that position would be to hold that police have probable cause to arrest anyone who, located in the general vicinity of criminal activity hours after the crime has occurred, acts in a manner that is out of the ordinary. It is, of course, wholly irrelevant that those issuing the directive had probable cause to arrest a man named Clarence Royalston; at the time of the directive, however, no one knew that the man discovered by Fullilove was in fact Royalston.

█ If the Government's position is that facts observed by Fullilove, when added to the collective knowledge of the other agents working on the case, constituted probable cause to arrest Royalston, it fares no better. The only additional fact observed by Fullilove before the arrest that conceivably bears on the probable cause question is that Royalston's clothes were "real muddy and wet from the chest down." Even if we could answer in the Government's favor "the difficult question" whether Fullilove had been given "that minimum quantum of reliable information necessary to application of the collective knowledge doctrine," *United States v. Head*, 693 F.2d 353, 359 (5th Cir.1982), we are still faced with an arrest based solely on (1) presence in the general vicinity of a crime hours after its commission; (2) while wearing muddy clothes; and (3) acting in an unusual manner. We do not think that the laminated total of those facts constitutes probable cause to arrest.

3. *Attenuation.*

█ The Supreme Court has written extensively on the attenuation issue. The mode of analysis we must employ, therefore, is clear: evidence of Royalston's second statement was properly received in evidence if the statement was voluntary and " 'sufficiently an act of free will to purge the primary taint [of the illegal arrest].' " *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d

441 (1963)). This is essentially a factual test, *id.*, which the Government must satisfy. *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982). Relevant factors that inform the inquiry include: (1) the temporal proximity of the arrest to the statement; (2) the presence of intervening circumstances; and (3) "the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. *Miranda* warnings factor into the analysis, but it is clear that voluntariness in a fifth amendment sense is merely a threshold requirement for admission of a statement following an illegal arrest; *Miranda* warnings alone do not break the causal connection between police misconduct and a subsequent statement. *Id.* at 603, 95 S.Ct. at 2261; *Dunaway*, 442 U.S. at 216–17, 99 S.Ct. at 2258–59.

█ While an initial tainted confession does not perforce render all statements that follow it likewise inadmissible, one statement may well "bolster ... the pressure for [defendant] to give the second, or at least vitiate any incentive on his part to avoid self-incrimination." *Brown*, 422 U.S. at 605 n. 12, 95 S.Ct. at 2262 n. 12. The district court nonetheless found that by the time Royalston reached Oxford and gave his second statement, the occurrence of several intervening events purged the taint that shrouded the Indianola statement: (1) Royalston's desire to talk to agent Maddox; (2) the car trip away from the scene of the crime to Oxford; (3) the giving of additional *Miranda* warnings at Oxford; (4) the care with which Maddox and Humphreys conducted the Oxford interrogation; and (5) the lapse of almost twelve hours. We cannot agree that these circumstances are sufficient to demonstrate that Royalston's second statement was an act of free will purged of the taint of his illegal arrest. Rather, we think, on the record before us, that the Government failed to discharge its burden of demonstrating that the statement was untainted.

We agree with Royalston that, as to attenuation, this case involves little that distinguishes it from *Brown* and *Dunaway*.

The district court's reliance on intervening circumstances such as the care with which the second interrogation was accomplished, the giving of additional *Miranda* warnings and Royalston's desire to speak "betrays a lingering confusion between 'voluntariness' for purposes of the Fifth Amendment and the 'causal connection' test established in *Brown*." *Dunaway*, 442 U.S. at 219, 99 S.Ct. at 2260. The only intervening event that arguably contributed to Royalston's "ability to consider carefully and objectively his options and exercise his free will," *Taylor*, 457 U.S. at 691, 102 S.Ct. at 2668, was the car ride from Indianola to Oxford. We note, however, that this circumstance is itself ambiguous: the trip was made in the presence of law enforcement agents under circumstances that arguably had a coercive effect. In short, in light of the facts that Royalston was in continuous custody, did not consult with a lawyer, was not able to contact family or friends, was not brought before a neutral magistrate, had likely been without sleep for a long period, and had already given one tainted statement, we must conclude that the Oxford statement was the product of Royalston's illegal arrest. Therefore, the district court erred in refusing to suppress the Oxford statement.

### C. *Weinrich's Motion to Suppress.*

Weinrich moved below to suppress evidence obtained "as the result of the illegal arrest of Weinrich and the illegal search of a motel room in Memphis, Tennessee, on February 12, 1983." Record Vol. I at 51. As noted above, Weinrich and Hartwell were arrested in room 224 of the Days Inn after a warrantless entry into the room by drug enforcement agents. Upon entry into the room, which was registered to Weinrich, agents observed a flight bag bearing "Candy Santiago's" name tag. Agents "secured" the room until a search warrant was obtained. They were in the process of drafting the affidavit at the time of the initial entry but included in it discovery of

Santiago's flight bag. The eventual search of Weinrich's room pursuant to the warrant revealed incriminating evidence which was offered against him at trial.

Weinrich complains that *all* evidence from room 224 should have been suppressed, whether discovered in plain view during the initial entry or unearthed after the full search. He also complains that the taint of illegal police conduct at the Days Inn extends to statements he made at the time of his arrest and to the testimony of government witness Rick Lowery.[11] The Government argued below that exigent circumstances—the fear that Weinrich and Hartwell might destroy evidence—justified the warrantless entry into room 224. Weinrich responded that the agents themselves created any exigent circumstances that existed by deliberately postponing attempts to obtain a warrant to search room 224 in favor of placing the room under surveillance in the hope of apprehending additional parties involved in the drug activity. The district court denied the motion to suppress because (1) agents reasonably delayed their attempts to obtain a warrant in order to continue their investigation; (2) the return of Hartwell and Weinrich to the room created exigent circumstances justifying a warrantless entry; (3) the arrest of Weinrich, after the lawful entry into the hotel room, was supported by probable cause; and (4) the search warrant was also supported by probable cause and was lawfully executed. Record Vol. VII at 1514–18.

Weinrich argues on appeal that agents needed a warrant to enter lawfully his hotel room either to arrest him or to search the room. He argues that the warrantless entry does not fall within the "exigent circumstances" exception to the warrant requirement because (1) exigent circumstances did not exist or (2) if they did, they cannot be relied upon here because they were created by the agents' own conduct. Finally, Weinrich again makes alternative

**11.** Lowery testified that around midnight on February 11 he gave Weinrich a ride from a truck stop in Indianola to a motel. Lowery first identified Weinrich from photographs taken at the Days Inn following the warrantless entry now at issue.

arguments linking the illegal entry into room 224 to the subsequent search warrant: (1) the affidavit supporting the warrant is based, in part, on information obtained from the illegal entry and (2) even assuming a wholly independent basis for the warrant, agents illegally occupied the room during the interim between the illegal entry and execution of the search warrant.

In order to assess these claims, we must briefly review the testimony adduced at the suppression hearing. All parties concede that probable cause to search room 224 developed in the early morning hours of February 12 when MBN agent Charles Spillers discovered the key to the room in Santiago's possession. Spillers testified that, after discovering the key, he left Indianola at about 4:00 a.m. on February 12 and drove to Memphis to coordinate surveillance of room 224. He arrived at about 8:30 a.m. and met with a Memphis narcotics officer at the Days Inn. Spillers testified that he spent the rest of the morning engaged in the following activities: (1) interviewing hotel personnel to determine if the room was occupied; (2) searching the general area around the hotel; (3) checking vehicles in the hotel parking lot; (4) setting up surveillance of room 224 from a hotel room located nearby; (5) interviewing personnel at the U-Haul outlet that owned the truck discovered at Indianola the night before; (6) awaiting the arrival of additional personnel to assist in the investigation; and (7) conferring with a United States attorney to determine whether a warrant was necessary before the room could be searched. The testimony made clear that obtaining a search warrant would require the cooperative efforts of Spillers—the only one in Memphis with full knowledge of the facts establishing probable cause—and a local officer with the authority to deal with Tennessee officials. Spillers testified that he began drafting a statement of probable cause soon after the United States attorney advised that a warrant was necessary. He had not quite finished when Hartwell and Weinrich arrived at the room.

The Government relies on exigent circumstances to justify entry into room 224.

Of course, if agents were lawfully in the room, Weinrich's subsequent arrest there on probable cause and the plain view observation of the contents of the room were likewise lawful. We consider first whether exigent circumstances existed and, if so, whether the Government is precluded from relying on them because they were manufactured by the agents themselves.

### 1. *Exigent Circumstances.*

We have recognized that a fear of the destruction of evidence is an exigent circumstance that may justify a warrantless entry into a private home. *See, e.g., United States v. Thompson*, 700 F.2d 944, 946, 947 (5th Cir.1983). "To prevail on this exception [to the warrant requirement], the government must demonstrate that the agents had reason to believe that the evidence was in danger of imminent destruction." *Id.* at 947–48. The district court here held that the Government successfully discharged this burden; we do not think that finding is clearly erroneous.

We have indicated that important factors relevant to the degree of exigency surrounding the fear of evidence destruction include (1) the agents' subjective belief; (2) information indicating that suspects are aware that police are on their trail; and (3) the knowledge that "efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic." *Thompson*, 700 F.2d at 948 (quoting *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.), *cert. denied*, 414 U.S. 833, 94 S.Ct. 174, 38 L.Ed.2d 68 (1973). *See also Scott v. Maggio*, 695 F.2d 916 (5th Cir.1983). Agents here testified unequivocally that they feared the destruction of evidence. *See Thompson*, 700 F.2d at 948 n. 2. The suppression hearing testimony supports the conclusion that the fears were reasonable: (1) Weinrich and Hartwell likely knew that the plane had not been unloaded in Greenville as planned and that their "partner" Santiago had been arrested and (2) shortly after Weinrich and Hartwell entered room 224, someone

peered between the curtains, as if acting as a lookout. Given these facts, we cannot characterize the district court's finding as clearly erroneous.

### 2. *Manufactured Exigency.*

Agents, of course, cannot deliberately create exigent circumstances in order to subvert the warrant requirements of the fourth amendment. *United States v. Scheffer,* 463 F.2d 567 (5th Cir.), *cert. denied,* 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972). Our first concern in analyzing a claim of manufactured exigency is whether agents could have obtained a search warrant prior to the development of the exigent circumstances upon which they relied. *Thompson,* 700 F.2d at 949. The district court here apparently found that agents could have obtained a warrant, in the sense that they had probable cause for a warrant, in the early morning hours of February 12. Of course, having probable cause alone is not enough; a warrant obviously cannot issue until an affidavit is prepared and a judge or magistrate with the proper authority is located. Considering these factors, the district court found that, practically speaking, the agents could not have obtained a warrant until early afternoon on February 12. In light of the testimony summarized above, we cannot say that determination is clearly erroneous.

■ We are faced therefore with a delay of only a few hours in obtaining a warrant during which time Spillers, according to his own testimony, was actively preparing an affidavit. The district court determined that this delay did not preclude agents from acting upon the exigent circumstances that arose when Weinrich and Hartwell returned to the room. We agree. In evaluating Weinrich's claim of manufactured exigency we must distinguish between cases where exigent circumstances arise naturally during a delay in obtaining a warrant and those where officers have deliberately created the exigent circumstances. It is, of course, axiomatic that agents are not required to obtain a search warrant as soon as it is practicable to do

so. *See Cardwell v. Lewis,* 417 U.S. 583, 595, 94 S.Ct. 2464, 2471, 41 L.Ed.2d 325 (1974). Moreover, an officer's failure to avail himself of an early opportunity to obtain a warrant will not automatically preclude him from relying on exigent circumstances that may arise thereafter. *Id.* at 595–96, 94 S.Ct. at 2472 ("The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action."); *Thompson,* 700 F.2d at 950. That the exigency was foreseeable at the time the decision was made to forego or postpone obtaining a warrant does not, by itself, control the legality of a subsequent warrantless search triggered by that exigency. *See United States v. Hultgren,* 713 F.2d 79, 88 (5th Cir.1983) (citing *United States v. Mitchell,* 538 F.2d 1230, 1233 (5th Cir.1976) (en banc), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977)).

■ Of course, we disapprove of gambling as police procedure; where possible, it is always preferable to go forward with efforts to obtain a warrant rather than to wait in hopes that "factors of exigence" will arise. *Mitchell,* 538 F.2d at 1233. Warrantless searches based on exigent circumstances must, of course, be reasonable, and "the opportunity to obtain a warrant is one of the factors to be weighed." *Vale v. Louisiana,* 399 U.S. 30, 40, 90 S.Ct. 1969, 1975, 26 L.Ed.2d 409 (1970). We have recently recognized that the reasonableness inquiry should also be informed by the nature of the investigation of which the warrantless activity is a part: a delay in obtaining a warrant is more likely to be reasonable when part of an "immediate, ongoing investigation" rather than a "planned" or "routine" search or arrest. *Hultgren,* 713 F.2d at 87 & n. 11. As we said in *Hultgren:*

> Indeed, in the case of the immediate ongoing investigation, new suspects and evidence of crimes committed became known only later in the investigation. Thus, unlike the case of the "routine" felony arrest, where a given individual

and a distinct crime is involved, the fluidity of an ongoing investigation of the distribution of narcotics makes the obtaining of an adequate search warrant more difficult to time in the flow of events. While the possibility of discovering additional participants or evidence of crimes does not negate the warrant requirement, we find that it is one factor to weigh in determining the reasonableness of the government's warrantless arrest.

*Id.* at 87.

As noted, we treat cases differently where agents do more than delay attempts to obtain a warrant and then act upon exigent circumstances that naturally arise. Where agents create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby. *United States v. Scheffer,* 463 F.2d at 574.

■ Weinrich claims that agents created exigent circumstances for the search of room 224 by (1) placing the room under surveillance rather than immediately attempting to obtain a warrant and (2) by allowing Weinrich and Hartwell to enter the room instead of stopping them as they approached. We reject the claim that agents manufactured exigent circumstances by placing the room under surveillance. This is simply a case of exigency arising naturally during a delay in obtaining a warrant. *See United States v. Mitchell,* 538 F.2d at 1233. This case does not involve the kind of deliberate conduct that we have indicated may amount to creation of, rather than reliance on, exigent circumstances. *See Thompson,* 700 F.2d at 951 (undercover agent confronting suspect knowing that suspect will recognize him); *Hultgren,* 713 F.2d at 88 (faking a transmitter failure).

■ Nor do we think that the failure to stop Weinrich and Hartwell before they entered the hotel room amounts to the deliberate creation of exigent circumstances. This simply is not a case where the agents "deliberately arrang[ed] to arrest the defendant while he is within certain premises so that they may take advantage of their presence within to seize evidence in plain view." 2 LaFave, *Search & Seizure* § 6.7(d) (1978). We think agents acted reasonably in not stopping Weinrich and Hartwell before they entered the room; this action allowed them to protect the safety of the hotel manager who accompanied Weinrich and Hartwell to the room as well as gave them a needed opportunity to confer with the manager to determine the identity of those who entered the room.

### 3. *Search Pursuant to Warrant.*

■ We also reject the claim that the search pursuant to the warrant was illegal. Having lawfully entered the room, agents' plain view observation of Santiago's name tag was perfectly legal; including that in the affidavit, therefore, was entirely proper. Moreover, we reject the claim that the securing of the hotel room while a warrant was obtained itself violated the fourth amendment even if nothing observed during the interim was used to obtain the warrant. Weinrich relies on *United States v. Allard,* 634 F.2d 1182 (9th Cir.1980), for the proposition that, following an illegal entry, agents cannot secure premises while obtaining a warrant. Fruits of the warrant must be suppressed even if the warrant had an independent source. *Id.* at 1187. Whatever the current status of the *Allard* rule, *see Segura v. United States,* —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1983) ("securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought" is not unreasonable seizure) (per Burger, C.J. and O'Connor, J.), it does not apply here. We have held that the initial warrantless entry into room 224 was legal. We think agents properly "limited the scope of warrantless searches to the rationale excepting the search from the warrant requirement," *United States v. Metz,* 608 F.2d 147, 155 (5th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980), by securing rather than searching. Therefore, we reject Weinrich's claim that the evidence discovered pursu-

ant to the full search should have been suppressed.

## IV. ERRORS OCCURRING AT TRIAL.

All appellants vigorously deny any criminal involvement in the theft of the King Air and the importation or possession of marijuana. They presented various exculpatory stories to rebut the picture painted by the Government's case in chief. We turn now to an analysis of various errors which appellants claim occurred at trial to the prejudice of their respective defenses.

### A. *Buhajla.*

Buhajla claims to be the innocent victim of a ruptured oil line: he testified that the King Air made an emergency landing at his airstrip in early February and that, after mechanics came and repaired it, the plane was mysteriously flown away about a week later. He denied emphatically that he was paid by his co-defendants to store the plane and insisted that he knew absolutely nothing about the theft of the plane or the importation of marijuana. Buhajla's defense consisted of his own testimony and that of four witnesses who all praised his reputation as a truth-teller and as a law-abiding citizen. In addition, he presented evidence that he had openly communicated to others that the King Air was stored on his property in early February. Leon Bibbins testified that Buhajla told many people that the King Air was at his airstrip. Similar testimony from Kay Dickson, however, was excluded on hearsay grounds. Buhajla claims on appeal that the district court erred (1) by excluding Kay Dickson's testimony that Buhajla did not conceal the existence of the King Air on his property and (2) by refusing Buhajla's request that seven witnesses be subpoened at Government expense.

### 1. *Subpoenas at Government Expense.*

Shortly before trial, Buhajla moved for issuance of subpoenas at Government expense for three witnesses from Arkansas and four witnesses from Illinois. The court granted the motion in part: Buhajla

was instructed to choose four of the seven witnesses listed in his motion for whom subpoenas were issued. Buhajla now argues that the district court arbitrarily limited him to four cost-free subpoenas. We note at the outset that only three of the four witnesses for whom subpoenas were authorized testified at trial; one of the witnesses for whom a subpoena was denied testified anyway.

Buhajla now claims that four of the witnesses he requested were character witnesses only but that the other three were also fact witnesses. We note, however, that nowhere *in the record* did Buhajla indicate what he intended to prove through the seven witnesses he requested. His written motion, Record Vol. II at 238, simply lists the witnesses names and addresses; apparently, no objection or offer was made in response to the court's limitation of subpoenas.

Rule 17(b), Fed.R.Crim.P., governs an indigent's right to have witnesses subpoened at Government expense. Of course, the issue is not entirely procedural; it implicates both the sixth amendment right to compulsory process and the fifth amendment protection against unreasonable discrimination based upon the ability to pay. *See, e.g., United States v. Hegwood,* 562 F.2d 946, 952 (5th Cir.1977), *cert. denied,* 434 U.S. 1079, 98 S.Ct. 1274, 55 L.Ed.2d 787 (1978). We have long held, however, that, within the limits imposed by the Constitution, "[t]he decision to grant or deny a Rule 17(b) motion is vested in the sound discretion of the trial court." *United States v. Bowman,* 636 F.2d 1003, 1013 (5th Cir.1981). As a threshold matter, an indigent seeking a Rule 17(b) subpoena must allege facts that, if true, demonstrate "the necessity of the requested witness' testimony." *Hegwood,* 562 F.2d at 952. The trial court may then exercise its discretion to deny the subpoenas if the Government demonstrates that the indigent's averments are untrue, *United States v. Goodwin,* 625 F.2d 693, 703 (5th Cir.1980), or if the requested testimony would be

merely cumulative or irrelevant. *Bowman*, 636 F.2d at 1013.

 Since Buhajla did not make a threshold showing on the record that the seven requested witnesses were "necessary to an adequate defense," Fed.R.Crim.P. 17(b), we cannot say that the district court abused its discretion by forcing him to choose four of them. We note that even if Buhajla had made a record showing below of what he has told us on brief, we would nonetheless uphold the district court's decision. Buhajla claims that the four Illinois witnesses were exclusively character witnesses. He intended for the three Arkansas witnesses, however, to testify about his character and also about facts relevant to his defense: they could testify that Buhajla made no attempt to conceal the fact that the King Air was stored on his property. Even with the court's limitation, then, Buhajla could have subpoenaed at Government expense a total of four character witnesses while at the same time compelling attendance of the only three fact witnesses he sought. Given a district court's wide latitude in limiting cumulative character evidence, *e.g.*, *United States v. Edwards*, 702 F.2d 529, 530 (5th Cir.1983), we could hardly find an abuse of discretion here.

### 2. *Kay Dickson's Testimony.*

 Buhajla also complains that the district court erroneously prevented his first witness, Kay Dickson, from testifying that Buhajla told her in the presence of six other people that a King Air was stored on his property in early February of 1983. The court sustained the Government's hearsay objection to this testimony. Buhajla argues that, since the out-of-court statement he made to Kay Dickson was not offered for the truth of the matter asserted, it did not constitute hearsay. We agree.

Hearsay, of course, is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Kay Dickson's testimony was not offered to prove the truth of the matter asserted by Buhajla—that a King Air was stored on his property. Rather, it was offered to support an inference of innocence: a man with guilty knowledge is not likely to advertise his possession of stolen property.

It is axiomatic that "verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted" is excluded from the federal definition of hearsay. Fed.R.Evid. 801(a) advisory committee note (1975). In *United States v. Parry*, 649 F.2d 292 (5th Cir. 1981), for example, defendant was charged with acting as an intermediary in drug sales between undercover agents and third parties. He claimed, however, that he had acted on the good faith belief that he was assisting the undercover agents in their investigation. To bolster his theory of the case, defendant offered his mother's testimony that he told her that the telephone calls he had been receiving were from a narcotics agent with whom he was working. We held that the testimony was erroneously excluded on hearsay grounds:

> As Parry explained to the district court, this statement was not offered to prove that the caller was a narcotics agent or that Parry was working with the agent, but to establish that Parry had knowledge of the agent's identity when he spoke. In other words, Parry offered the statement as the basis for a circumstantial inference by the jury that, if this statement was in fact made—a question which the in-court witness would testify to while under oath, before the jury, and subject to cross-examination—then Parry probably knew of the agent's identity. Using an out-of-court utterance as circumstantial evidence of the declarant's *knowledge* of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule.

*Id.* at 295 (emphasis supplied). Here, Dickson's testimony was offered as circumstantial evidence of the declarant's *ignorance*

of some fact. Since the statement was offered simply to support an inference which the jury might reasonably have drawn regardless of the truth of the assertion, we think it was clearly not hearsay.

■ We are convinced, however, that exclusion of Kay Dickson's testimony was harmless error. In the past, we have applied both the "harmless beyond a reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and the "substantial influence" standard of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to erroneous hearsay rulings. *Compare United States v. Martinez*, 588 F.2d 495, 499 (5th Cir.1979) *with United States v. Parry*, 649 F.2d at 296. The error here was harmless under either standard.

Although Kay Dickson was not allowed to testify about Buhajla's public avowals with respect to the King Air, Buhajla himself testified about a conversation he had with Kay Dickson during which several people heard him state that a King Air was parked on his property. It is true that exclusion of Dickson's testimony deprived Buhajla of evidence corroborating this specific aspect of his own testimony. The point of this evidence, however, was simply to demonstrate that Buhajla publicly acknowledged the King Air's presence on his property; the fact that Buhajla's statement was made to Kay Dickson was not itself significant to the defense. Leon Bibbins testified without objection that Buhajla "was proud that he had a King Air that landed at this short strip" and that Bibbins was "around many, many times when he talked about it." Record Vol. XXV at 3348. It appears, therefore, that evidence with the same exculpatory value as Kay Dickson's excluded testimony was presented to the jury. The jury obviously refused to draw the inference of ignorance that, according to Buhajla, follows from this evidence. In light of the direct testimony that Buhajla was paid $1000 a day to store the plane and that he originally told investigators, until he was shown photographs indicating the opposite, that there had never

been a King Air on his property, we are convinced that Kay Dickson's testimony would not have tipped the balance in Buhajla's favor. *Cf. United States v. Gonzalez*, 700 F.2d 196, 202 (5th Cir.1983) (harmless error to exclude evidence of out-of-court corroborating statement where trial testimony to same effect was rejected as unbelievable).

### B. *Murphy.*

#### 1. *Handcuffs.*

■ Murphy claims that the trial court erred by denying his pre-jury selection, alternative motions to quash the entire venire or for a mistrial. On the first day of trial Murphy claimed that a large number of prospective jurors saw him exit an elevator and walk down a corridor with handcuffs on. In response to Murphy's motions, the court interviewed the marshals who had accompanied Murphy from the elevator and discovered that "some," but not "a majority" of the jurors probably saw Murphy in handcuffs. He was carrying some books at the time, was clean-shaven and was wearing a coat and tie. The court denied the motions but took steps to ensure that the incident was not repeated. Given the fleeting nature of this incident and Murphy's failure to request a cautionary instruction, we discern no error in the denial of his motions. *See, e.g., United States v. Escobar*, 674 F.2d 469, 479 (5th Cir.1982); *United States v. Diecidue*, 603 F.2d 535, 549–50 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).

#### 2. *1000 Pounds of Marijuana.*

Counts two and three of the indictment allege conspiracy to possess and possession with intent to distribute approximately 1500 pounds of marijuana. Section 841 of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 841, makes it unlawful to possess certain controlled substances, including marijuana, with the intent to distribute them. Subsection (a) defines the substantive offense; subsection (b) sets forth the maximum pen-

alties available to the sentencing judge for a violation of subsection (a), which vary with the nature of the controlled substance involved. In 1980, subsection (b) was amended to increase the maximum penalty for possession of large amounts of marijuana: possession of one thousand pounds or less triggers a maximum penalty of five years' imprisonment and a $15,000 fine, 21 U.S.C. § 841(b)(1)(B); possession of more than one thousand pounds subjects the offender to an enhanced penalty of fifteen years' imprisonment and a $125,000 fine, 21 U.S.C. § 841(b)(6).

Based on the indictment in this case, appellants were all subject to the enhanced penalties of section 841(b)(6). At the close of the Government's case, Murphy moved for judgment of acquittal with respect to the enhanced penalties on the ground that the Government had not proved that there were more than one thousand pounds of marijuana in the King Air. Royalston and Weinrich made similar motions, but took them one step further: They argued that the Government forfeited the right to section 841(b)(6) enhancement by destroying the marijuana before appellants had a chance to weigh and test it for themselves.

The trial court denied the motions on the ground that the Government's evidence, if believed, would support a finding that the King Air contained more than one thousand pounds of marijuana. The court accommodated appellants' claims that the Government failed to prove more than one thousand pounds by submitting counts two and three to the jury with a lesser included offense instruction of possession and conspiracy to possess less than one thousand pounds of marijuana. The court, however, rejected the claim that the Government forfeited the right to seek enhanced penalties by destroying the marijuana, finding that agents did not act in bad faith when they destroyed the evidence. The jury obviously found that the King Air contained more than one thousand pounds of marijuana: each of the convictions on counts two and three is for the greater of the offenses charged.

The Government's evidence with respect to disposition of the marijuana seized at Greenville can be summarized as follows: On the morning of February 12, agents unloaded fifty-six bales of marijuana from the King Air and stacked them in a hangar at the Greenville airport. Agents photographed the marijuana and observed that the bales appeared to be approximately the same size. DEA agent D.L. Boyles weighed twelve bales which, except for the three smallest, were between thirty-three and thirty-eight pounds each. The three smallest bales weighed approximately twenty-five pounds each. Boyles retained the three smallest bales and, with the permission of an assistant United States attorney, destroyed the remaining marijuana in an incinerator at a local hospital. Boyles filled twelve small storage bags with samples from some of the bales before they were placed in the incinerator. DEA chemist Margaret Stevenson examined the material collected by Boyles and determined that it was in fact marijuana. The three complete bales that Boyles retained and the twelve smaller samples were received in evidence.

Murphy claims on appeal that, because the Government deliberately destroyed the marijuana, section 841(b)(6) enhancement is unavailable and evidence of the marijuana's weight should have been excluded. The Government responds that the issue is moot because Murphy did not receive an enhanced penalty: he was sentenced to four years' imprisonment on both counts two and three. Webster, however, who did receive an enhanced penalty, has adopted Murphy's treatment of the issue. *See* Fed. R.App. p. 28(i). Therefore, without considering the validity of the Government's claim that the issue is moot as to Murphy, we will consider the effect of the Government's destruction of the evidence.

■ We reject the argument that the Government cannot seek section 841(b)(6) enhancement unless it retains all of the marijuana seized until defendants can weigh it for themselves. Since Murphy supports his argument to the contrary with

vague allusions to a prosecutor's constitutional duties under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we consider first the constitutional implications of subjecting appellants to enhanced penalties notwithstanding destruction of the marijuana. The Supreme Court has recently grappled with a state's constitutional duty to preserve evidence. In *California v. Trombetta*, —— U.S. ——, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Court held that a state may constitutionally introduce breath-analysis tests in drunk driving prosecutions even though the state has failed to preserve defendant's breath samples for his inspection. Without defining the precise parameters of the constitutional rule, the Court noted that "[w]hatever duty the Constitution imposes ... to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* 104 S.Ct. at 2534. Evidence meets this "standard of constitutional materiality," if (1) it "possess[es] an exculpatory value that was apparent before the evidence was destroyed" *and* (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* The Court held that breath samples did not meet this test because "the chances are extremely low that preserved samples would have been exculpatory" and the defendant has other means available to attack the breath-test results. *Id.* 104 S.Ct. at 2534–35. *See also Killian v. United States*, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961) (destruction of notes later incorporated into FBI report is not impermissible destruction of evidence).

Applying the *Trombetta* standard, we are not convinced on the facts of this case that subjecting appellants to enhanced pen-

alties is fundamentally unfair. We note at the outset that the record reveals not the slightest hint that agents destroyed the marijuana in bad faith to circumvent disclosure requirements. In fact, the district court specifically found that the agents destroyed the marijuana in good faith, according to accepted DEA procedures.

Moreover, we do not think that the marijuana possessed an apparent "exculpatory value" [12] with respect to application of section 841(b)(6) enhancement. *Trombetta* makes clear that the mere possibility that evidence might aid the defense does not satisfy the constitutional materiality standard; rather, if the record reveals that "the chances are extremely low that preserved [evidence] would have been exculpatory," destruction of that evidence does not render a conviction or sentence fundamentally unfair. *Id.* 104 S.Ct. at 2534. The record here reveals a sufficiently low probability that, had the marijuana been preserved, appellants would have been able to establish that it weighed less than one thousand pounds. The Court in *Trombetta* was impressed by the accuracy of the breath analyzers used by California law enforcement agencies: "In all but a tiny fraction of cases, preserved breath samples would simply confirm the Intoxilyzer's determination that the defendant had a high level of blood-alcohol concentration...." Surely, if DEA agents weighed each bale before destruction on carefully calibrated scales, a similar deference to accuracy would be appropriate. While we would feel more comfortable if they had, we are convinced that the method used here to calculate the marijuana's weight was sufficiently accurate to render nugatory the exculpatory value of preservation.[13]

---

**12.** *Trombetta*, of course, deals with evidence relevant to defendant's guilt or innocence. It is clear, however, that constitutional duties to preserve and disclose evidence apply as well to evidence relevant to the degree of punishment to be received. *E.g., id.* 104 S.Ct. at 2532; *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196. We use the term "exculpatory value," therefore, to refer to the tendency of the evidence to reduce the likelihood of an enhanced penalty.

**13.** Even if we assume that all bales weighed twenty-five pounds—the weight of the lightest bale discovered by agents—the estimated total weight comes to fourteen hundred pounds (25 pounds × fifty-six bales = fourteen hundred pounds). We are not faced, therefore, with a close case where determination of exact weight is likely to be important; we express no opinion about such a case.

In addition, we are convinced that appellants had alternative means, beyond weighing the marijuana itself, to challenge the Government's claim that it weighed more than one thousand pounds. The agent who weighed the marijuana and the chemist who tested it were both available for cross-examination. *See Trombetta*, 104 S.Ct. at 2535. Moreover, agents retained sample bales which presumably were available for inspection. Appellants therefore had a means available to them to test any claim that the agents' method of estimating weight included the weight of extraneous material, such as packaging or stalks, *see* 21 U.S.C. § 802(15) (excluding stalks from definition of marijuana). Finally, the Government produced at trial photographs of the scales used to weigh the marijuana; we note that none of the appellants sought production of the scales themselves or a continuance to test them. We do not think, therefore, that appellants were prejudiced by the destruction of the marijuana. We find no impediment, constitutional or otherwise, on these facts to subjecting appellants to enhancement.

We note that some courts have, while refusing to overturn convictions, expressed concern with Government destruction of drugs and other evidence. *See, e.g., United States v. Young*, 535 F.2d 484, 488 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976); *United States v. Heiden*, 508 F.2d 898, 903 (9th Cir.1974) (Merrill, J., concurring). Our research reveals, however, only one case disallowing section 841(b)(6) enhancement because of a destruction of evidence. The court in *United States v. Zimmerli*, (36 Crim.L.Rep. (BNA) 2012, Sept. 12, 1984), held that the Government forfeited the right to seek enhancement when it destroyed an estimated 4300 pounds of marijuana pursuant to a court order. In light of our analysis above, we think this case adopts an overly mechanistic approach, and we refuse to follow its reasoning.

We also note that with respect to the conspiracy counts, enhancement does not hinge on a finding that appellants actually *possessed* more than one thousand pounds; their sentences may be enhanced if they simply *conspired* to possess

### 3. *The Fuel Ticket.*

■ Murphy complains that the trial court erred by receiving in evidence various copies of a receipt from Rockport Aviation in Fulton, Texas, for the sale of 448 gallons of jet fuel on February 11, 1983. At least three copies of the receipt were admitted at trial: Government Exhibits 123 and 139 and Defendant's Exhibit 5. The parties dispute whether another copy, Government Exhibit 88, was actually received in evidence. Murphy complains that *all* copies of the fuel receipt should have been excluded because they all contain unexplained mark-outs and alterations.

Receipt of the fuel ticket was damaging to Murphy's defense. As noted, the Government maintained at trial that Murphy and Wells flew the King Air from Ozark, Arkansas, to Mexico and back to Mississippi on February 11, 1983. Wells, who provided much of the Government's case against the appellants, testified that Murphy landed the King Air somewhere in south Texas to refuel during the trip to Mexico. It is undisputed that at the time of Murphy's arrest officers discovered a fuel ticket in his possession. The Government claimed that that fuel ticket was a carbon copy of a receipt prepared by employees of Rockport Aviation and given to Murphy during the refueling stop described by Wells. If so, the fuel ticket would both connect Murphy with the plane and corroborate Wells' testimony.

The Government ran into problems below, however, because it does not have the fuel ticket that was discovered in Murphy's possession on the night of his arrest. The Government claimed that agents photocopied the fuel ticket and inadvertently returned it to Murphy and that Murphy then destroyed it. According to the Government, Exhibits 88 and 123 are photocopies made shortly after Murphy's arrest of the

more than one thousand pounds. *See United States v. Wright*, 742 F.2d 1215 (9th Cir.1984) (upholding enhancement on conspiracy conviction where agents harvested growing marijuana before it reached the thousand pounds).

fuel ticket discovered in his possession. Exhibits 88 and 123 appear identical, except for extraneous markings apparently made by agents for purposes of identification, and clearly reflect that on February 11, 448 gallons of jet fuel were pumped into a plane bearing registration number N487OP.[14] Defendant's Exhibit 5 is also a photocopy and, again except for extraneous identification markings, appears identical to Government Exhibits 88 and 123 with two significant exceptions: (1) the date on Exhibit 5 is blotted out and (2) the registration number appears to have been marked over to read N4876B. Government Exhibit 139, which was introduced through the testimony of the owner of Rockport Aviation, is an original which, according to the Government, was filled out simultaneously with Murphy's carbon copy. It is identical in material respects to the Government Exhibits 88 and 123.

Murphy claims in a conclusory fashion that "[t]he alteration of the Rockport documents which were not properly explained by the person making the alterations rendered them inadmissible." We reject this argument. Murphy points to the discrepancy between Defendant's Exhibit 5 and the Government exhibits and also to the fact that the Government exhibits, although consistent with each other, also show signs of an altered registration number. *See* note 14, *supra.* The Government claims that the alterations on the Government exhibits were adequately explained and that Defendant's Exhibit 5 was deliberately altered by Murphy to reduce its evidentiary value after it was produced during pretrial discovery.

We note that the first of these exhibits to be introduced in evidence was Defendant's Exhibit 5. Murphy initially objected to introduction of Government Exhibit 123 on the ground that the Government had not adequately accounted for the absence of the original possessed by Murphy on the night of his arrest. After unavailability of

the original was established, Government Exhibit 123 was received in evidence without objection. Government Exhibit 139 was likewise received as evidence without objection. Murphy's objection that the exhibits reveal unexplained alterations, therefore, is made for the first time on appeal. Moreover, Murphy himself introduced a copy of the fuel receipt with the very alterations about which he now complains. We find no plain error in the court's handling of these exhibits. In fact, we think the exhibits were handled in strict accordance with the Rules of Evidence. *See* Fed.R. Evid. 1003 ("A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original...."); Weinstein & Berger, *Weinstein's Evidence* ¶ 1003[02] (where there is a dispute about changes on duplicates, "both the claimed unaltered version and the corrected counterpart should be admitted").

### 4. *Extrinsic Offenses.*

██ Murphy claims that the trial court should have declared a mistrial as to Murphy because Government witness Wells repeatedly testified about extrinsic crimes committed by Murphy. He cites, however, to only two examples in the record of objectionable testimony by Wells about Murphy. In both instances, the trial court overruled Murphy's objections and allowed Wells to testify. We are not convinced that the trial court erred in either instance.

Rule 404(b), Fed.R.Evid., provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Such evidence is admissible, however, upon satisfaction of the prerequisites outlined in *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), if it is relevant to an issue other than character, such as "motive, opportunity, intent, preparation,

---

**14.** The registration number on all three copies offered by the Government also appears to have

been marked over but clearly reads N487OP.

plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). It is clear, however, that "[a]n act is not extrinsic, and Rule 404(b) is not implicated, where the evidence of that act and the evidence of the crime charged are inextricably intertwined." *United States v. Torres*, 685 F.2d 921, 924 (5th Cir.1982).

The first alleged violation of Rule 404(b) to which Murphy draws our attention merits little discussion. Wells testified, in discussing a meeting between Murphy and Buhajla about payments for storing the plane, that Murphy said "No. You remember this last deal or whatever—." He was cut off by Murphy's objection, however, and, although the objection was overruled, never resumed this thought. Even if the objection was erroneously overruled, this fleeting, unexplained reference to the "last deal" is obviously not reversible error.

■ The second instance occurred during Wells' description of the refueling of the King Air in Mexico. He testified, over Murphy's objection, that Murphy said that the fuel had to be pumped carefully because "the last time they had got fuel ... had gotten dirt in the fuel and they had to land the plane someplace...." We agree with the Government that this evidence of a prior plane trip to Mexico was "inextricably intertwined" with evidence of the conspiracy charged in the indictment. *Torres*, 685 F.2d at 924. Therefore, we discern no error in allowing this testimony.

Finally, Murphy alleges generally that Wells' testimony about past conduct of his co-conspirator Webster also prejudiced him. In light of our disposition of Webster's argument, *see* part IV, C, *infra*, we reject this claim.

#### C. *Webster.*

■ Webster also complains that Wells testified repeatedly about extrinsic offenses committed by Webster. Webster concedes that the trial court sustained his objections to these instances and repeatedly admonished the jury to consider only the crimes charged in the indictment in this case; he argues, however, that the cumula-

tive effect of this testimony could not have been cured by instructions to disregard. We disagree. We recognize that "the cumulative effect of several incidents of ... improper argument [or questioning] may require reversal, even though no single one of the incidents, considered alone, would warrant such a result." *United States v. Canales*, 744 F.2d 413, 450 (5th Cir.1984). We have carefully reviewed Wells' testimony, however, and do not think that the cumulative effect of references to extrinsic offenses required a mistrial. Therefore, we find no error in the district court's refusal to declare a mistrial. *See, e.g., United States v. Uptain*, 552 F.2d 1107, 1108 (5th Cir.) (judges' limiting instructions cured effects of extrinsic offense testimony), *cert. denied*, 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142 (1977).

### V. JURY MISCONDUCT.

The evidence in this case closed on July 19, 1983, and on that day the Government and four of the defendants presented closing arguments. Arguments of the remaining defendants, along with the Government's rebuttal, took place the next morning. During a short recess on the first day of argument, juror McCall announced in the jury room that

he was not listening to the arguments and didn't know why they had to do it, that the defendants were guilty from day one, that he ... wasn't listening to the argument. And ... further ... if he caught them or anyone else selling dope or drugs to his kids he would kill them.

Record Vol. XXVII at 3913.

Apparently, an alternate juror informed the marshal of this statement at the close of the court's session on July 19, and the marshal informed the trial judge. Early the next morning, before resuming arguments, the court separated the offending juror from the panel and, by interviewing the juror who initially reported the incident and one other juror, verified that the statement had in fact been made. At that point, the judge for the first time informed counsel for the Government and the defendants

of the developments and announced his intention to interview each juror separately and on the record but outside the presence of counsel and the defendants. The court did not give counsel a chance to propose alternative means of handling the situation but noted that, since the interviews would be transcribed, there would be ample "opportunity for motions at a later time."

The court then interviewed each juror privately and, with slight variations in wording, asked them each the same three questions: (1) Did you hear juror McCall express an opinion about the case?; (2) If so, can you disregard his opinion and give the case your fair consideration?; and (3) Have you expressed an opinion yourself about how the case should be decided?

Of the fourteen jurors interviewed, eight told the judge that they heard McCall's comments. The remaining six said either that they had not heard McCall speak or that they were generally aware that he was talking but did not pay any attention. All fourteen told the judge that they had not themselves expressed an opinion about the case. The judge admonished each juror that McCall's comments constituted a gross violation of the court's instructions. Each juror in turn assured the court that he could give the Government and each of the defendants a fair trial and would decide the case based on his own honest convictions. Finally, the court advised each juror that, while the others would also be interviewed, the conversations with the judge should not be discussed.

The court then informed the parties that it intended to replace McCall with an alternate juror but that the trial would continue because, in the court's judgment, the remaining jurors had not been tainted by McCall's premature expression of an opinion. All defendants then joined in a motion for a mistrial on the ground that, given the impossibility of determining the extent to which McCall's comments affected the other jurors, a fair trial was no longer possible. The thrust of the motion was that a juror asked whether he has an open mind is simply going to tell the court or counsel

what he thinks the court wants to hear: *even if counsel had been present to ask questions,* appellants argued, the substantial danger of prejudice could not be dispelled by voir dire. In effect, defendants argued that McCall's comments were inherently prejudicial and that a mistrial should be automatic in such circumstances. The court denied the motion and placed the transcript of the juror interviews under seal. The trial then continued.

Appellants all raised the jury misconduct issue in post-trial motions seeking judgments of acquittal or a full evidentiary hearing. The court denied the motions in a thoughtful memorandum opinion on the ground that, in contradistinction to the case of a jury influenced by outside forces, a trial court faced with a jury tainted from within has broad discretion to poll the jurors without the participation of counsel or even to refuse to address them at all. Citing the potentially disruptive and coercive effect of interrogation by ten defense lawyers and two government lawyers, the court adhered to its earlier decision that counsel should not be allowed to voir dire the jury. Based on the in camera interviews, the court remained satisfied that the impartiality of the jury was not compromised. In the same opinion, the court released the transcript of the juror interviews.

All appellants assign as error the trial court's handling of the McCall incident. They argue that McCall's comments clearly prejudiced the remaining jurors and that we should therefore grant them a new trial. In assessing this claim, they ask us to apply a presumption of prejudice which, they argue, was not rebutted by the promises of fairness obtained by the court during the in camera interviews. Appellants also argue that, even without a presumption of prejudice, the record of the juror interviews clearly reveals that the partiality of the remaining jurors was compromised by McCall's statements. Finally, they argue that, regardless of the extent of prejudice reflected in the record, they are entitled to a new trial or a full evidentiary

hearing because the trial judge erroneously excluded them from the juror interviews and did not himself conduct an adequate inquiry.

■ We note at the outset that, sitting as we do far from the daily rigors of trial, we are in a particularly inappropriate position from which to judge the effect of a juror's premature expression of an opinion as to guilt on the minds of the other members of the jury panel. That is precisely why we have traditionally left the manner of handling jury misconduct to the sound discretion of the trial judge. *See, e.g., United States v. Chiantese,* 582 F.2d 974, 978 (5th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). In so doing, however, we have distinguished between jury panels tainted by outside influence, such as publicity or direct appeals from third parties, and panels on which one or more of the jurors themselves have violated an instruction of the court. *Id.* at 979. In the former case "a presumption of prejudice arises when the outside influence is brought to the attention of the trial court, *Remmer v. United States,* 347 U.S. 227, 229 [74 S.Ct. 450, 451, 98 L.Ed. 654] (1954), and it is incumbent upon the Government to rebut that presumption at a hearing, *id.; Richardson v. United States,* 360 F.2d [366, 369 (5th Cir. 1966) ]." *Id.* at 979. The failure to hold a hearing in such a situation constitutes an abuse of discretion and is reversible error. *United States v. Herring,* 568 F.2d 1099, 1103–06 (5th Cir.1978). Counsel should be present at any hearing held to assess outside influence on the jury. *United States v. Forrest,* 620 F.2d 446, 458 (5th Cir.1980).

■ Appellants argue that we have also drawn a finer distinction in juror misconduct cases. They point to *Chiantese,* 582 F.2d at 979, where we apparently divided inside influence cases into those involving juror discussions about guilt or innocence and those involving juror discussions about collateral matters, such as the conduct of defense counsel. In *Chiantese,* we upheld the trial court's decision not to hold a hearing to investigate a discussion between jurors during which one juror was said to have criticized defense counsel. Appellants argue that *Chiantese* did not decide the proper way to handle a case involving the premature discussion of guilt or innocence.[15] They argue that we should follow the lead of the Ninth Circuit and apply a presumption of prejudice in such cases as well. *See United States v. Shapiro,* 669 F.2d 593, 602 (9th Cir.1982).

We are reluctant to adopt a rule that would unduly bridle the discretion of district judges who, as we are ever mindful, are obviously in a far better position from which to control the flow of trial. As we said in *Chiantese:*

> In determining whether to conduct a hearing in [a jury misconduct case] the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by that misconduct. We, as an appellate tribunal, are in a poor position to evaluate these competing considerations; we have only an insentient record before us. The trial court is in a far better position to judge the mood at trial and the predilections of the jury. The trial court, therefore, must enjoy a broad discretion in these matters.

582 F.2d at 980.

To adopt a presumption of prejudice in this type of case would be to remove effectively this discretion from the trial court, *see, e.g., United States v. Forrest,* 620 F.2d 446, 458 (5th Cir.1980). We are not convinced that the premature expression of an opinion about the merits of a case rises to the level of pervasive publicity or jury tam-

---

**15.** Apparently, we have not been faced with such a case. In *Grooms v. Wainwright,* 610 F.2d 344 (5th Cir.), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980), a state habeas case, we implied that a statement about the merits should be treated the same as a *Chiantese* statement about defense counsel. *Id.* at 347. In *Grooms,* however, unlike the instant case, it was not clear that the juror had in fact made the offending statement.

pering. *See Grooms v. Wainwright*, 610 F.2d 344, 348 (5th Cir.) ("Moreover, a juror's statement that '[from] what I heard already he's guilty' ... before the defendant presents any evidence does not reflect serious prejudice....."), *cert. denied*, 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980).

At any rate, we do not find it necessary to decide if a presumption of prejudice should be applied in all cases of this nature. The trial court handled the McCall incident as if a presumption of prejudice existed, with one exception: he conducted a hearing but did not allow counsel to participate. Whether we consider the presence of counsel bottomed on the need to rebut a presumption of prejudice or as emanating from the defendant's general right to be present at all stages of the trial, *see* Fed.R. Crim.P. 43, our inquiry is the same: were appellants prejudiced by the in camera nature of the juror interviews? *See United States v. Yonn*, 702 F.2d 1341, 1345 (11th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 263, 283, 78 L.Ed.2d 261 (1983).

A review of the transcript of the juror interviews belies any claim that appellants were prejudiced by the trial court's refusal to allow them to participate. We think the trial court did an admirable job of evaluating the extent of prejudice without contributing to the problem by over emphasis. Moreover, we agree with the trial court that the interviews reveal that the jury was still capable of impartiality. Appellants cite to various places in the juror interviews where the trial court's inquiry is allegedly flawed. We have carefully reviewed these, and we disagree. Therefore, we reject appellant's claims with respect to juror misconduct.

## VI. SUFFICIENCY OF THE EVIDENCE.

Buhajla and Murphy both claim that the evidence is insufficient to support their convictions on count one for violation of the Dyer Act, 18 U.S.C. § 2312. Of course, we must reject these claims if "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Fowler*, 735 F.2d 823, 826 (5th Cir.1984). For the purpose of this inquiry, we must "tak[e] the view [of the evidence] most favorable to the Government." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

The Dyer Act makes unlawful the interstate transportation of a motor vehicle or aircraft "knowing the same to have been stolen." 18 U.S.C. § 2312. "The elements which the government must prove to establish a Dyer Act violation are that there was a stolen vehicle, that the defendant knew that the vehicle was stolen and that the vehicle was transported by the defendant in interstate commerce." *United States v. Martinez*, 694 F.2d 71, 72 (5th Cir.1982). Murphy claims that the Government failed to prove that the plane was stolen; Buhajla argues that even if the plane was stolen the evidence does not establish that Buhajla knew it.

### A. *Was the plane stolen?*

We think the evidence, which we summarize below, is clearly sufficient to demonstrate that the plane was stolen. Count one alleges that the subject of the Dyer Act violation is "a Beechcraft King Air airplane whose registration number had been changed from YV437CP to N487OP." Record Vol. I at 1. Raul Rangel testified that he is an advisor-consultant to Atemar, a Venezualan corporation, and that he was acting as the corporation's agent. Through Rangel, the Government introduced documents, Government Exhibits 61, 62 and 63, indicating that Atemar owned a King Air registered under the number YV437CP. Rangel testified that the plane had been flown to Fort Lauderdale, Florida, on January 31, 1983. He further testified that Atemar did not give permission to anyone other than the pilot or co-pilot to remove the plane from Florida but that the plane was stolen from Fort Lauderdale in early February. He also testified that Atemar directed the pilot, Jorge Salvatierra, to file a theft report. Fort Lauderdale police officer Robert Red-

sicker testified that on February 2, 1983, he answered a call regarding the theft of a King Air, No. YV437CP, and that he prepared and notarized an "Aircraft Theft Affidavit" from information supplied by Salvatierra. The affidavit, Government Exhibit 60, was received for the limited purpose of showing that a theft had been reported. Finally, Rangel testified that Atemar had been notified on February 23, 1983, that the King Air had been located and that he was authorized by United States Customs to return it to Venezuala.

This evidence, which was not contradicted, clearly establishes that King Air No. YV437CP was stolen from the Atemar corporation. Murphy complains that the evidence was incompetent because Rangel's testimony was hearsay.

We reject this claim. Even if Rangel's testimony that Atemar did not give permission for the plane to be flown from Florida was inadmissible hearsay, its admission was harmless beyond a reasonable doubt. There was overwhelming evidence that the plane was stolen beyond Rangel's testimony, *see United States v. Phillips*, 664 F.2d 971, 1027 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982): (1) Atemar's ownership of the plane was conclusively established through documentary proof; (2) a theft report was filed on behalf of Atemar; (3) Rangel testified from his own personal knowledge that Atemar directed the pilots to file a theft report; (4) Wells testified that Murphy told him that the plane was stolen; (5) the plane's registration number was altered; and (6) material observed in the plane indicated a connection with Venezuala.

We reject the claim implicit in Murphy's arguments that the owner must testify in order to establish that a vehicle was stolen. *See United States v. Gresham*, 585 F.2d 103 (5th Cir.1978) (upholding Dyer Act conviction without testimony of owner of vehicle). Moreover, Murphy's reliance on *United States v. Shiver*, 414 F.2d 461 (5th Cir. 1969), is unconvincing because the evidence here is far more complete that the vehicle was stolen.

### B. *Did Buhajla know the plane was stolen?*

We think the evidence supports the conclusion that Buhajla knew the plane was stolen. We agree wholeheartedly with Buhajla that "the mere presence of an individual in the vicinity of stolen goods is not sufficient in itself to support a conviction." *United States v. Henderson*, 524 F.2d 489, 491 (5th Cir.1975). We disagree, however, that the Government's evidence merely establishes that a stolen plane was located on Buhajla's property. Buhajla ignores the testimony of Wells that Buhajla was intimately involved with Murphy and was paid handsomely for storing the plane. Buhajla disputed this version of the story but "[w]e are particularly loath to reject a jury's verdict when it is manifestly dependent on credibility assessments." *United States v. Kimble*, 719 F.2d 1253, 1256 (5th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

## VII. SENTENCING.

Finally, Buhajla argues that the two-year sentence he received on count one is unduly harsh. A strict standard governs our review of this claim: "Absent an illegal sentence or a gross abuse of the trial judge's broad discretion, we will not disturb a sentence on appeal." *United States v. Robinson*, 700 F.2d 205, 214 (5th Cir. 1983) (quoting *United States v. Noll*, 600 F.2d 1123, 1130 (5th Cir.1979)). Buhajla must show that the district court relied on materially untrue information or abused its discretion. *United States v. Garcia*, 693 F.2d 412 (5th Cir.1982).

The two-year sentence Buhajla received is well within the five-year maximum authorized for Dyer Act violations. *See* 18 U.S.C. § 2312. Since he alleges no fact which would indicate that the trial judge abused his discretion, we can afford him no relief. His conclusory pleas for leniency are more appropriately addressed to the sentencing judge. *See* Fed.R. Crim.P. 35.

## VIII. CONCLUSION.

For the reasons set forth above, we affirm the convictions of all appellants except Clarence Royalston. Royalston's conviction is reversed because some of the evidence used to convict him was the fruit of his illegal arrest.

AFFIRMED IN PART, REVERSED IN PART.